**SO ORDERED.**

**SIGNED this 17 day of June, 2021.**



**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

___

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 18-05399-5-SWH |
| | CHAPTER 7 |
| PAUL LEON PFEIFER, | |
| DEBTOR | |
| | AP NO. 19-00010-5-SWH |
| BRRRT PROPERTIES, LLC, BRADLEY SIZEMORE, and ROSEMARY SIZEMORE, | |
|         Plaintiffs, | |
| v. | |
| PAUL LEON PFEIFER, JNJ NC ENTERPRISES, INC., and D&P PROPERTY SOLUTIONS, LLC, | |
|         Defendants. | |

**POST-TRIAL ORDER REGARDING DISCHARGEABILITY OF CLAIMS**

This adversary proceeding was initiated by plaintiffs BRRRT Properties, LLC, Bradley Sizemore, and Rosemary Sizemore pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(4) to determine the dischargeability of a debt owed to them by chapter 7 debtor Paul Pfeifer and his related entities, JNJ NC Enterprises, Inc. and D&P Property Solutions, LLC. A trial was held in Raleigh, North


Carolina, on March 11, 2021. For the reasons to follow, partial judgment will be entered for plaintiffs.

## JURISDICTION

The bankruptcy court has jurisdiction over the parties and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. This is a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2)(I), which this court may hear and determine.

## PROCEDURAL POSTURE AND BACKGROUND

Prior to trial, defendants filed motions to dismiss the adversary proceeding and the first amended complaint. (Dkt. Nos. 8, 17) Both motions were denied by order entered on October 4, 2019. (Dkt. 34) Defendant Pfeifer filed his answer on November 4, 2019 (Dkt. 35) and on November 11, 2019, plaintiffs obtained an entry of default as to the corporate defendants, JNJ NC Enterprises, Inc. and D&P Property Solutions, LLC. (Dkt. 38) Plaintiffs then sought and obtained a default judgment providing that the corporate defendants' debt to plaintiffs is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2) and (a)(4), which was entered on November 14, 2019.[1] (Dkt. 40)

Plaintiffs filed a motion for summary judgment on June 24, 2020 (Dkt. 45), to which defendant Pfeifer filed a response. (Dkt. 48). After a telephonic hearing on September 17, 2020,

---

[1] The court has determined that this default judgment, which provides that "any debt owed by the Corporate Defendants to Plaintiff is excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4)," was entered erroneously. A bankruptcy court has no authority to determine the dischargeability of a debt owed to a creditor by a party that is not a debtor, nor does the court discern a basis upon which it could have entered this default judgment against some but not all defendants. The judgment will be vacated by separate order.

the court entered an order denying the motion as to all issues except one: the defendant's assertion that the defense of accord and satisfaction barred plaintiffs' claims based on the partial performance of a settlement agreement executed by the parties on February 23, 2017. While the parties agreed that the $200,000 judgment referenced in paragraphs 4(i) and 4(ii) of that agreement had been satisfied, dischargeability of the $446,000 confession of judgment referenced in paragraph 4(iii) remained at issue. As to this amount, the court held that while the settlement agreement "may have worked a kind of novation, it did not bar a showing that the settlement debt arose out of 'false pretenses, a false representation, or actual fraud,' and consequently was nondischargeable." Dkt. 54 at 3, citing *Archer v. Warner*, 538 U.S. 314, 323 (2003).

Trial of this matter was held in Raleigh, North Carolina, on March 11, 2021, at which time the court heard testimony from plaintiff Bradley Sizemore and the debtor/defendant, Paul Pfeifer. At the conclusion of the trial, the court invited the parties to provide post-trial briefs in summation of the evidence and arguments, which both plaintiffs and Pfeifer elected to do. (Dkt. Nos. 71, 72) As is set out in more detail below, the court determines that of the total $435,174.00 amount asserted by plaintiffs, the sum of $250,000 is nondischargeable.

## DISCUSSION

Plaintiffs assert that their claim against defendant for the remaining balance of the confession of judgment amount should be deemed nondischargeable under 11 U.S.C. §§ 523(a)(2) and/or (a)(4), and the court will address each section separately. Plaintiffs bear the burden of proof and must establish an exception to discharge by the preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287-88, 291 (1991); *Farouki v. Emirates Bank Int'l., Ltd.*, 14 F.3d 244, 249 (4th Cir. 1994).

Non-dischargeability provisions are "to be interpreted narrowly." *In re Theonnes*, 536 B.R. 680, 697 (Bankr. D.S.C. 2015), *citing Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998) (noting the "'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed'" (internal citation omitted)); *see also In re Causey*, 519 B.R. 144, 154 (Bankr. M.D.N.C. 2014) ("If this Court were to interpret Section 523(a) as allowing equitable exceptions to discharge under general common law principles, such a holding would impermissibly widen the scope of these provisions of the Code and, in effect, swallow-up or render superfluous those exceptions enumerated in Section 523(a).").

**I.     Determination of the Debt Plaintiffs Seek to Declare Nondischargeable**

As a threshold matter, prior to the court determining the extent to which a debt may or may not be dischargeable, plaintiffs must establish both the existence and amount of that debt. *In re Campbell*, 545 B.R. 875, 885-86 (Bankr. M.D.N.C. 2016); *see* § 523(a)(2)(A) (providing that discharge under chapter 7 does not discharge an individual debtor from any *debt* for money "to the extent obtained by ... false pretenses, a false representation, or fraud"). Plaintiffs contend that the nondischargeable debt owed to them by the defendant is the total sum of $435,174.00. That sum is derived from an unfiled confession of judgment in the amount of $446,000.00 provided by all defendants to plaintiffs in connection with their execution of a settlement agreement on February 23, 2017, less the sum of $10,826.00, which defendant Pfeifer already has paid pursuant to that agreement. *See* Plaintiffs' Ex. 26A (setting out calculations). The parties agreed that the $446,000 judgment would not be filed so long as Pfeifer made monthly payments of $600 for ten years (for a total of $72,000 in repayment) and did not default on the agreement. Pfeifer paid a total of $10,862 prior to stopping payments.

Separately, the settlement agreement also required defendants' execution of a $200,000.00 confession of judgment which was filed in New Hanover Superior Court and was to be cancelled by plaintiffs upon defendants' satisfaction of certain terms. Under the agreement, the bases for that judgment and terms for satisfaction of it were as follows: 1) That plaintiffs' funds went into Pfeifer's purchase of certain real property referred to in the agreement as the "River Knolls Lots"; 2) that escrowed property sale proceeds in the amount of $30,647.50 from the sale of some of those lots would be paid to plaintiffs; 3) that the remaining River Knolls Lots would be sold and the sale proceeds paid to plaintiffs; and 4) that upon payment to plaintiffs of both the escrowed and expected sale proceeds in the combined sum of approximately $180,000, plaintiffs would cancel the $200,000 judgment. The parties agree that Pfeifer complied with those aspects of the agreement and that the $200,000 judgment has been satisfied. Notwithstanding demand by Pfeifer that plaintiffs cancel the judgment, plaintiffs refused to do so.

In this proceeding, plaintiffs seek a determination that the entire $446,000 confession of judgment amount[2], less the $10,826 in monthly payments paid by Pfeifer, is nondischargeable. This calculation does not account for Pfeifer's satisfaction of the $200,000 judgment, which represents Pfeifer's repayment of a portion of plaintiffs' calculated losses and must be credited toward the $435,174.00 amount. Indeed, the court cannot discern any basis on which this amount could be

---

[2] The confession of judgment amount closely corresponds to what plaintiffs claim to be their total investment loss of $444,330.35. *See* Ex. 26A. That amount includes not only the losses incurred in connection with the 6243 Turtle Hall and 402 Pierpoint Drive transactions, discussed *infra*, but also plaintiffs' expenditures for other properties and renovations within the parties' house-flipping venture (317 Scottsdale Drive, 242 Central Boulevard, and 5016 Clear Run Drive) as well as other properties, such as the River Knolls lots. With respect to those properties, there are no allegations that the debtor engaged in false representations or pretenses, fraud, embezzlement, or larceny.

accounted for in any other way. The remaining amount of $235,174.00 is the debt at issue here, and for the reasons set out below, the court concludes that plaintiffs have met their burden of establishing by a preponderance of the evidence that this debt is nondischargeable.

## II. Money obtained by false pretenses, false representation, or fraud under § 523(a)(2)(A)

Plaintiffs contend that Pfeifer obtained the investment funds at issue by way of false pretenses, a false representation, or fraud. The discharge exceptions listed in § 523 do not themselves establish liability, and instead operate to except from discharge certain types of liabilities established under non-bankruptcy law. To establish false pretenses, a false representation, or fraud under § 523(a)(2)(A), plaintiffs must show that

> (1) the debtor made a representation; (2) that the debtor knew the representation was false at the time it was made; (3) that the debtor intended to deceive the creditor; (4) that the creditor relied on the representation; and (5) that the creditor sustained a loss as a result of that reliance.

*Campbell,* 545 B.R. at 885-86, *citing In re Casper*, 466 B.R. 786, 793 (Bankr. M.D.N.C. 2012). To establish a claim for fraud under North Carolina law, the plaintiffs were required to provide proof of a false representation or concealment of a material fact, reasonably calculated to deceive and made with intent to deceive, which does in fact deceive and results in damage to the injured party. *See, e.g., Campbell,* 545 B.R. at 876; *Nunnery v. Rountree*, 478 F.3d 215, 218 (4th Cir. 2007).

At trial, plaintiffs' evidence focused on six specific parcels of real property in Wilmington, North Carolina, all of which were part of the parties' property-flipping venture.[3] Pursuant to this

---

[3] Plaintiff Bradley Sizemore testified that a separate written joint venture agreement ("JVA") existed for each of the six properties, while Pfeifer testified that there was only one written JVA, which was for the first property, located on Dean Drive. Plaintiffs did not offer into evidence any written JVA other than the Dean Drive agreement.
    The evidence established that the parties entered into one written JVA for the Dean Drive property and subsequently proceeded without benefit of new written agreements. In

venture, which began in late 2013 and ended in late 2015, defendant Pfeifer located properties to purchase, quickly renovate, and sell for profit. Pfeifer and his entities would buy the properties and provide to Sizemore the opportunity to pay half the investment and renovation costs. Upon the sale of a property in which both parties had invested, the plan was that each party would recoup their investment and then share the net profits 60/40, with Pfeifer taking the larger share. The first property, 4621 Dean Drive, was acquired by defendants for approximately $98,000 and became the subject of the parties' written joint venture agreement, dated December 11, 2013. Pfeifer purchased builder's insurance on the property, completed the renovation, and then sold it. Both Sizemore and Pfeifer testified that this first transaction worked well and was satisfactory to all concerned. Plaintiffs invested a total of $68,906.96; that amount, together with plaintiffs' $19,442.50 share of the profits, was paid to plaintiffs on September 26, 2014.

Next, plaintiffs invested $165,272.95 in the venture by means of a check dated April 2, 2014, with that amount intended to apply to 50% of the acquisition costs of two properties: 6243 Turtle Hall, at a cost of $250,000, and 317 Scottsdale Drive, at a cost of $79,000. Sizemore testified credibly that he presented the check to Pfeifer based on Pfeifer's representation that he already had purchased the properties at those prices, and after Sizemore walked through the Turtle Hall property with Pfeifer, where construction work was underway and Pfeifer discussed the improvements to be made. However, at that time, Pfeifer had not purchased and did not own Turtle Hall. Pfeifer testified that at the time, he intended to purchase the property, but ultimately did not acquire it

---

consequence of this loose arrangement, the evidence did not support a determination of precisely which of the various other real properties acquired by defendants came within the parties' expectations of their joint venture. For the reasons to follow, resolution of that question is not material to the court's determination of dischargeability.

7

because he was outbid by another buyer. Pfeifer did not correct the false representation to Sizemore: instead, he subsequently reinforced Sizemore's belief that defendants owned the Turtle Hall property and were renovating it as part of the venture by purchasing builder's insurance on that property, falsifying a HUD-1 purporting to show defendants' acquisition of it for cash, falsifying a deed of trust to show ownership, and preparing a fictitious contract to sell the property. Pfeifer and his entities did purchase, insure, and renovate the Scottsdale Drive property.

On September 26, 2014, plaintiffs invested an additional $228,500 in the venture, with that amount representing plaintiffs' 50% share of the total acquisition costs of three properties: 242 Central Boulevard ($60,000), 402 Pierpoint Drive ($250,000), and 5016 Clear Run Drive ($129,000).[4] Sizemore testified credibly that Pfeifer represented that he already had purchased 402 Pierpoint, and walked Sizemore through the property prior to Sizemore providing that payment. In fact, Pfeifer had not purchased and did not own 402 Pierpoint Drive. Pfeifer testified that as with Turtle Hall, he *intended* to purchase the property, but was outbid by another buyer. And again as with Turtle Hall, Pfeifer did not correct the false misrepresentation and instead perpetuated Sizemore's belief that defendants owned the property, and were renovating it as part of the venture with plaintiffs, by purchasing builder's insurance and subsequently falsifying and presenting to Sizemore a HUD-1 purporting to show acquisition of the property and a deed of trust to show ownership. Pfeifer and his entities did purchase, insure, and renovate the Central Boulevard and Clear Run Drive properties.

---

[4] The court notes that the acquisition costs do not precisely correspond with the actual or purported purchase prices of the properties (half the purchase price for these properties would be $219,500, not $228,500; half of the acquisition cost for Turtle Hall/Scottsdale would be $164,500, not $165,272.95), but these discrepancies may be disregarded as they are not material to the outcome of the court's analysis.

In the last installment, on June 4, 2015, plaintiffs provided to defendants two additional checks totaling $70,000, with that amount to be applied to ongoing renovation costs. Plaintiffs' evidence did not show precisely how these funds were (or were not) allocated. This lack of specificity is consistent with what the evidence showed to be the fluid nature of the parties' business arrangement, which was a loose agreement whereby profit from sales and/or unspent investment funds could be "carried over" or reallocated from one property to another with little discussion between the parties.

Based on the foregoing, the court determines that the remaining debt of $235,175 is nondischargeable. Plaintiffs have satisfied their burden of proving, by a preponderance of the evidence, that the sums of money provided by plaintiffs to Pfeifer to pay plaintiffs' half the purchase price of 6243 Turtle Hall and 402 Pierpoint Drive were obtained from Sizemore by Pfeifer's use of false representations that defendants owned those properties, and Pfeifer's corresponding concealment of the material fact that they did not. Even if, as Pfeifer testified, he "genuinely intended" to purchase the properties in the future, any intent to take a future corrective action clearly would not negate the fact that the defendant knew his representations were false when he made them. The false representations were made to induce Sizemore to take action *at that time*, which Sizemore did. The evidence showed that these false representations and corresponding concealment were in each instance reasonably calculated and intended to deceive Sizemore, did deceive him, and induced him to provide half of the (purported) $250,000 purchase price of Turtle Hall and half of the (purported) $250,000 purchase price of Pierpoint Drive. Pfeifer obtained a total of $250,000 from plaintiffs as a direct consequence of plaintiffs' reliance on those false representations.

The court agrees with the defendant that other false representations made *after* the plaintiffs provided the monies at issue are not material to determining nondischargeability under § 523(a)(2)(A) because, as the evidence makes clear, the defendant did not *obtain* any monies as a result of them. Certainly, these extensive misrepresentations permitted the defendant to *sustain* the subterfuge that induced plaintiffs to part with the funds in the first place; that, however, is not a basis upon which to determine dischargeability under § 523(a)(2)(A). The $235,174.00 debt will, for the reasons set out above, be deemed nondischargeable under § 523(a)(2)(A).

### III.    Money obtained by embezzlement or larceny under § 523(a)(4)

Alternatively, plaintiffs assert that defendants obtained the investment funds through either embezzlement or larceny. To be nondischargeable under § 523(a)(4), the debt must be "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." For an action to "rise to the level of 'embezzlement' for purposes of § 523(a)(4), the following three elements must be shown: (i) the creditor entrusted money or property to the debtor; (ii) the debtor appropriated the money or property for a use other than that for which it was entrusted; and (iii) the circumstances indicate a fraudulent statement." *Federal Ins. Co. v. Sorge*, 566 B.R. 369, 381 (Bankr. E.D.N.C. 2017) (internal citation omitted). Under applicable North Carolina state law, a plaintiff must show that the defendant is a person under N.C. Gen. Stat. § 14-90 who has embezzled or fraudulently or knowingly and willfully misapplied, or converted to his own use, any money or property that "belongs to" any other person or corporation. *See, e.g.*, *Mason v. Mason (In re Mason)*, Adv. P. 16-05002, 2017 WL 1628889, at *4 (Bankr. W.D.N.C. May 1, 2017), *quoting State v. Parker*, 756 S.E.2d 122, 124 (N.C. App. 2014); *State v. Murphy*, 567 S.E.2d 442 (N.C. App. 2002).

The evidence discussed in the preceding section establishes, by a preponderance of the evidence, that defendant Pfeifer sought and received plaintiffs' funds by representing that he would invest those funds for a specific and agreed-upon purpose, which was to share the purchase and renovation costs of specific parcels of real estate. Instead, Pfeifer diverted a portion of those funds to other uses without plaintiffs' knowledge or agreement, causing injury to plaintiffs. Defendant's contention that he "merely acquired different parcels of real property" for the venture instead of the ones he said he had acquired is hardly a cure; to the contrary, it corresponds quite closely with the elements of embezzlement. The extensive and uncontradicted evidence regarding actions Pfeifer subsequently undertook to perpetuate plaintiffs' continuing reliance on his false representations established additional circumstances indicative of fraudulent intent. The court concludes that plaintiffs have satisfied their burden of showing, by a preponderance of the evidence, that the debt should be deemed nondischargeable under § 523(a)(4) on grounds of embezzlement.

Finally, it appears to the court that plaintiffs' larceny claim, which could be established only by proof of an unlawful taking, is inconsistent with the factual premises that must be (and were) proven to establish the embezzlement claim. The court raised this issue prior to trial and, though plaintiffs did not concede that providing the evidence necessary to prove their embezzlement claim would preclude a claim for larceny, they ultimately presented no evidence in support of that claim. Accordingly, the larceny claim fails on those grounds.

## CONCLUSION

The court has determined that the debt owed by defendant Pfeifer to plaintiffs is in the amount of $235,174.00. The entirety of that amount is nondischargeable, plaintiffs having established by a preponderance of the evidence that the debt was obtained by false representations

under § 523(a)(2)(A), and alternatively is a debt for embezzlement under § 523(a)(4). A separate judgment will be entered.

**END OF DOCUMENT**